In the Matter of the Estate of FRANCES J. GOTTSCHALK, Deceased.

Surrogate's Court, New York County, April 4, 1938.

*Cardozo & Nathan* [*Michael H. Cardozo, Jr., Sidney B. Cardozo* and *Robert London* of counsel], for Benjamin Mordecai, petitioner, trustee.

*George Lion Cohen* [*I. Henry Kutz* of counsel], for Natalie P. Harris and Samuel Harby Plough, as assignee of Allen Harby Plough, respondents.

*Hilbert I. Trachman* [*Irving R. Krosner* and *Theodore Carsons* on the brief], for Maud Cornelius, William Henry Cornelius, and Phyllis Cornelius, as assignee of Maud Cornelius and William Henry Cornelius, and Phyllis Cornelius, as a remainderman under the trust for Charles J. Williams, respondents.

*Wolf & Kohn* [*Theodore W. Adler* of counsel], for Cecile Frances Adler.

*Sidney Rossman* [*Benjamin H. Fried* of counsel], for the Association for the Improved Instruction of Deaf Mutes (now known as Lexington School for the Deaf).

*Proskauer, Rose & Paskus,* for the Mount Sinai Hospital.

*Mayer L. Halff,* for May and Felix Mendel.

*Henry Fluegelman,* for Charles J. Williams.

*Davidson & Mann,* for Catherine Woolf Cohn.

*Caldwell & Raymond,* for Eugene L. Mordecai and Walter C. Mordecai, as executors of Annie J. Williams, deceased.

DELEHANTY, S. A construction is sought to determine whether there is a partial intestacy affecting the fund heretofore in trust for the life use of Annie Williams. It is now ready for distribution. After directing payment of her debts and after making certain bequests deceased provided for the division of her residuary estate into two parts. One part she appropriated to the life use of her sister Annie Williams. The other was devoted to the life use of her sister Cecile Woolf. Of the two sisters Cecile Woolf was the younger.

As to the part in trust for the latter's benefit it was provided that upon her death the trustee should distribute the principal fund in specified amounts to sixteen named remaindermen. Fifteen remaindermen were individual relatives of deceased. A charitable corporation was the sixteenth. Except for three of the fifteen individuals so sharing, provision was made in every instance for the substitution of the respective issue of such of them as should happen to predecease the life beneficiary. In the cases of the three individual remaindermen differently treated, his share (assuming death before the life beneficiary) was bestowed on the charitable corporation. These directions were carried out when Cecile Woolf died.

In respect of the other half of the residuary estate set aside for the benefit of the older sister, Annie Williams, deceased directed that the income be paid to her sister for life. Envisaging the possibilities of death of Annie Williams before herself and as well of her sister's survival of her and being desirous of providing modestly for her sister's husband should he outlive his wife, deceased included in her will the following direction to her trustee:

" (a) To continue to hold in trust Twelve Thousand Dollars ($12,000) of the principal of said one equal part and to apply the net income thereof to the use of Charles J. Williams, the husband of my said sister, Annie Williams, during the term of his natural life, and upon his death, or if he predecease the said Annie Williams,

then upon her death, or if both the said Charles J. Williams and the said Annie Williams predecease me, then upon my death to pay over and distribute said Twelve Thousand Dollars ($12,000) as follows:"

The remaindermen of this $12,000 fund were to be a charitable corporation, a nephew and a grandniece.

The will then directs the trustee

" (b) To continue to hold in trust the balance of said equal one part and to apply the net income therefrom to the use of my sister, Cecile Woolf, during the term of her natural life, and upon her death, if she survive the said Annie Williams, or if both the said Cecile Woolf and the said Annie Williams predecease me, then upon my death to pay over and distribute the principal thereof, as follows:"

Fourteen remaindermen of this fund are named. Thirteen of them are individual relatives of the testatrix. The fourteenth is a charitable corporation. Substitutional provisions were made similar to those described above in connection with the trust for the life of Cecile Woolf.

Cecile Woolf died prior to the death of her older sister, Annie Williams. Thus it became impossible to hold the balance of the Annie Williams' fund for the life use of Cecile Woolf. Distributees of deceased who represent a minor interest in the fund in the event of intestacy argue that intestacy must be decreed as to that portion of the principal sum which thus could not be set apart for the secondary life use of Cecile Woolf. In their argument these distributees contrast the language used in subdivisions (a) and (b) quoted above. They point out that while testatrix expressly provided for distribution to her named remaindermen in the event that Charles Williams should predecease Annie Williams, she failed so to do in respect of the balance of the fund in the event that Cecile Woolf should predecease Annie Williams. The argument is that " the testatrix purposely chose language [in paragraph b] entirely different from that which she had used in the immediatley preceding paragraph. Instead of providing, as she did in ' a ' that if the second life tenant predecease Annie Williams, then upon Annie Williams' death, the remainders were to have effect, she chose contrasting, different and apt language to provide that the remainders were to have effect upon the death of the succeeding life tenant upon the express condition ' if she survive the said Annie Williams ' * * *. In (a), survivorship of the second life tenant is *expressly excluded* as a condition to the vesting of the subsequent estate; in (b) survivorship is *expressly mentioned* and *expressly made* such a condition."

In the course of the hearing the draftsman of the will was called to testify respecting the instructions he had received from testatrix concerning the provisions of her will. The attorney for the distrib-

utees here contending for a partial intestacy objected to the testimony and at its close moved to strike it out. When it was offered the court stated that a record might be made and so received the testimony subject to the motion to strike it out. It reserved decision on the motion. This motion must be and is granted. The will being unambiguous the testimony of the draftsman is incompetent.

All the parties are in agreement on the general principles which must govern the court in the determination of this construction question. The intention of deceased is decisive. The court may not undertake to construct a new will. To determine the testamentary intention the court must look to the language of the will. To look to the language of the will does not mean so to focus on a phrase as to isolate it from its context, which is then to be forgotten or ignored. When the will is read as a whole and when each phrase is carefully examined in itself and in its context it is impossible to find validity for the contention of the distributees. It is true that deceased said that her named remaindermen were to take if Cecile Woolf survived Annie Willimas. Nowhere, however, did she say that the remaindermen were *not* to take if Cecile Woolf predeceased Annie Williams. When the will is examined to find what deceased said was to happen in that contingency silence only is encountered. But the testamentary scheme as a whole is eloquent enough. " If a general scheme is found to have been intended, which is valid, it is the duty of the court to carry it into execution and thus effectuate the purpose of the testatrix. When the intention is ascertained, the mode of expression, *or an inadvertent omission in some particular*, should be subordinated to the intent without regard to technical objections if in harmony with the general scheme and purpose of the will. The primary effort should be to find the testatrix's general scheme and carry her purpose into effect, to which even general rules of interpretation are subservient." (*Williams* v. *Jones*, 166 N. Y. 522, 533.) (Italics supplied.)

It is plain that the general intention of deceased was to vest the remainder in her fourteen named beneficiaries and to postpone enjoyment of the fund only so long as both Annie Williams and Cecile Woolf should live. She attached no special importance to the circumstance that Cecile Woolf might predecease Annie Williams since she provided in express words that if both predeceased herself without regard to which died earlier these remaindermen were to enjoy immediate use of the fund. The life estates here were in no sense conditions precedent affecting the vesting of the remainder. (*Matter of Fordham*, 235 N. Y. 384, 387; *Norris* v *Beyea*, 13 id. 273, 287.)

If the contention of the distributees were sound, the testatrix would be deemed to have intended that the death of Cecile Woolf prior to that of Annie Williams — and that alone — would suffice to prevent the fourteen named remaindermen from taking the principal. So to rule would involve then a finding that deceased favored distribution in intestacy which would give the estate of Annie Williams, the primary life beneficiary, a one-fifth interest in the fund and would give a nephew, the trustee who is expressly named in the will for another bequest, a one-tenth interest therein. These remarkable consequences were scarcely within the actual intention of deceased nor are they in contemplation of law a part of her intention.

Although the answer to the construction question before the court is manifest upon a careful reading of the will, any lingering doubt must be dispelled by *Mead* v. *Coolidge* (179 N. Y. 386) which is a controlling authority since it is on its facts nearly identical with the present case. There testator directed a division of his residuary estate into four parts to be held in separate trusts for his brother, two sisters and his son. As to the funds for his brother and sisters he directed that on termination of the respective life measuring a fund the principal should be added to the trust fund of which his son was beneficiary. Upon the death of the son the principal of the primary fund for his benefit was devoted to testator's next of kin. Provision was made for the same distribution of the principal sums in which the brother and sisters had life interests after these sums had been added to the trust for the son and had been enjoyed by him for life. Contemplating the death of his son prior to his own demise the testator directed that in such event the testator's next of kin should take the portion of his estate which if his son had survived him would have constituted the trust fund designated for him including the funds in which the brother and sisters had primary life interests. All four beneficiaries survived testator. The son was the first to die. It was claimed that as to the three funds set aside for the life use of his brother and two sisters the testator had not disposed of the remainders in the event which happened. The situation is thus exactly like that now before this court. GRAY, J., said (p. 390): " It is not reasonably possible, upon the reading of this will, to say that the testamentary scheme is not manifest * * *. In effect, it is argued that there is no express gift, and none can be implied, of the three trust funds in the event which has happened and, hence, as to so much of his residuary estate, the testator died intestate. It is true, of course, that the particular event, which has happened, is not described in the will and that we may infer that the testator did not suppose

that his son would fail to survive the older lives; but that will not suffice to defeat the evident testamentary scheme." And (at pp. 391, 392): " While the courts will not make wills for testators, whose testamentary expressions are unintelligible, or hopelessly conflicting, or defective to so great an extent as to come under the condemnation of accepted rules for the construction of wills, they will adopt a meaning which effectually and lawfully disposes of the property according to a manifest intention of the testator. The only difficulty in this case is that a condition, intermediate between the creation and the eventual vesting of the estate in those designated to enjoy it in remainder, became impossible. It could not be added to the trust estate created for the testator's son; for that had fallen in and been disposed of. But, evidently, that was not of the essence of the testator's gift. At most it must be regarded as incidental to the testator's plan." These apt words fit the present case. The court accordingly finds that there is no partial intestacy under the terms of the present will.

Objections to the account require consideration. In February, 1928, the trustee purchased for $30,000 a certificate of participation in a bond and mortgage. The objections question the trustee's purchase and also his retention of this certificate. The certificate purports to evidence a participation in what is called " a prior and superior share " of $1,300,000 in a $1,350,000 mortgage. This mortgage and the bond secured by it required the making of principal payments of $13,000 on each first day of June and December beginning in 1929 and continuing until December 1, 1933, when the whole unpaid balance of the mortgage became due.

The text of the participation certificate in controversy provides: " Lawyers Title and Guaranty Company hereby assigns to the holder hereof (describing the trustee as such) an undivided share of thirty thousand dollars and interest thereon at the rate of five per cent per annum from the date hereof, in the bond and mortgage hereinafter specified, equal and coordinate with all other shares assigned or retained by the company, the aggregate amount of all such shares, issued and retained, at no one time to exceed the amount then owing on said bond and mortgage." The issuing company guaranteed principal and interest. In the certificate is a paragraph headed: " The conditions of this certificate." In this the issuing company reserved to itself the exclusive right to collect principal and interest and to enforce the bond and mortgage for account of all participants. Then follows a description of the bond and mortgage and of the property on which it is a lien. At the foot of the certificate are the following words: " This certificate subject to the above conditions matures on December 1, 1933."

Certificates evidencing participations in the same mortgage were issued in identical text to various other persons. Many of these certificates contained the maturity date December 1, 1933, just as did the certificate here in controversy. Nine certificates were issued, each for $13,000, which matured respectively on the same dates as the dates fixed in the bond and mortgage for the payment of the principal installments of $13,000. In the case of each of these nine certificates the sole differences between any of them and the certificate here in controversy are (a) in the amount of it, (b) in the name of the assignee, and (c) in the fact that the maturity date is earlier than December 1, 1933. Objectants assert that the trustees could not invest lawfully in the certificate here in controversy because there were issued and outstanding the nine certificates just mentioned. This objection requires construction of the statutes regulating investments by trustees.

The first statutory enactment dealing with parts or shares of a bond and mortgage seems to have been chapter 385 of the Laws of 1917, effective May 17, 1917. This enactment added to subdivision 7 of section 188 of the Banking Law (this subdivision is headed " Investments ") text which so far as here pertinent says: " Investments in bond and mortgage by any such corporation as executor * * * may be made by apportioning to any estate or fund * * * a part interest in a bond and mortgage held by * * * such corporation * * * in any representative capacity * * *; but such bond and mortgage shall be a legal investment for trustees under the laws of this State * * * and any part interest in such bond and mortgage so apportioned shall at all times be and remain at least equal in lien to any other interest therein."

The next enactment in point of time was chapter 544 of the Laws of 1918, effective May 8, 1918. This enactment amended both section 111 of the Decedent Estate Law and section 21 of the Personal Property Law. So far as here pertinent the text which was added to each of these sections provided that a trustee thereafter might invest " in shares or parts of such bonds and mortgages, provided that any share or part of such bond and mortgage so held shall not be subordinate to any other shares thereof and shall not be subject to any prior interest therein." Each of these statutory enactments remained unchanged in text through 1931. No act of the trustee after 1931 is the subject of complaint.

While the trustee here was not a banking institution and so did not come within the scope of the 1917 amendment of the Banking Law it is appropriate that such law be considered in the search for the meaning of the statutes regulating generally investments

by trustees in shares or parts of mortgages. The directions in section 21 of the Personal Property Law and in section 111 of the Decedent Estate Law are applicable to trustee banking institutions as well as to other trustees. The changes made in 1918 seem to have been intended to conform the investment restrictions in the Personal Property Law and in the Decedent Estate Law to those put into the Banking Law in the prior year. It is reasonable to assume that the two enactments had the same purpose. Does the difference in text require a holding that there is any difference in meaning? In the amendment of 1917 it is said that the part interest " shall at all times be and remain at least *equal in lien* to any other interests therein." (Italics supplied.) In the enactment of 1918 the restriction is that the part or share " shall not be *subordinate* to any other shares thereof and shall not be subject *to any prior interest* therein." (Italics supplied.) Are shares maturing in December, 1933, *subordinate* to shares maturing earlier? Or are the shares maturing in December, 1933, *subject to a prior interest* because nine certificates evidencing participations in the same mortgage were issued with maturities prior to December, 1933?

If the mortgage were looked at as one held by a trustee for a single trust no one could say that there was any difference in the quality of the security for the money payable under the mortgage on June 1, 1929 ($13,000), and that for the money payable under the mortgage on December 1, 1933 (the balance then due after amortizations). Assuming (though not holding) that the certificates maturing on installment dates sufficiently earmarked the respective principal sums paid in reduction of the mortgage for the holders of such earlier maturing certificates, is that fact of any *legal* consequence in measuring this mortgage against the statutory standard of legal trust investments? All certificates state that the holder has " an undivided share * * * equal and coordinate with all other shares " when speaking of the interest assigned. When fixing the date of liability of the company the certificates differ. But no date of payment under the mortgage is or can be accelerated or deferred by reason of any date in any certificate. The date in the certificate fixes the time when the holder may collect according to its terms whether or not payment under the bond and mortgage is made. The certificate imposes a liability on the issuing company for which the latter's general funds must answer if need be. No defense to the certificate would be available to the issuing company because the installment in fact had not been paid when the certificate matured.

The point litigated can be sharply presented by assuming that the trustee here was the first purchaser of a participation in this mort-

gage. When he presented himself at the counter of the issuing company and said that he wanted a $30,000 investment to run for five years he would have received for his money precisely the certificate which he now has. If he had then and there asked to be shown the bond and mortgage he would have seen that they provided for amortization payments. Obviously he could not be charged with an improper investment merely because the principal sum secured by the mortgage was to be amortized. Provision for amortization of principal is sound practice — as the current depression has taught both mortgagors and mortgagees. The trustee could have bought the whole mortgage (assuming as well that the money was in hand) and he would have been subject to no criticism because of the amortizations. Nor could the trustee be charged in the assumed case with an improper investment because he knew that the issuing company intended to sell interests in the mortgage to others. The quality of his act must be tested on the basis of his conduct not on any fortuitous transaction between the issuing company and another. It may well be that one purchaser would desire early repayment of his investment while another would insist on a long fixed term. Unless an amortized mortgage is to be held unavailable for trust investment (no one urges this), the only basis of criticism must be that each purchaser of a participation therein must take, willy-nilly, his proportion of each amortization payment in order to comply with the statute.

The court does not so construe the statute. So to rule would mean that a trustee purchasing such a certificate would have to take cash which in most instances he did not want. The amortizations here amounted in each case to one per cent of the principal. So an investor of $30,000 would find himself over the five-year term possessed of nine separate sums of $300 for which he would have to seek some place of reinvestment. One who invested $1,000 would have ten dollars in cash paid him on each amortization date. The statute should not be held to require such a process of investment nor such a result. The meaning of the 1917 act is found in the different text of the 1918 amendments. Each text says that equality of *lien* is the test. If an interest is not *subordinate* nor subject to a *prior* interest (1918), it is " *at least equal in lien* " (1917). Each text means the same thing.

If then the test is equality of *lien* there is nothing to the argument of illegality. Plainly every part of the $1,300,000 debt was originally *equal in lien* to every other part. The payment of any part of this equally secured debt necessarily improved the security for the unpaid balance. No change in *lien* of the balance was occasioned thereby. On default *before* any amortization was due the mortgaged

property would be foreclosed for account of *all* participants including those who held the certificates maturing on the not-yet-arrived amortization dates. When any payment was made each part of the whole remaining balance was secured equally with every other. No participant could at any time say validly that his *security* differed from that enjoyed by every other participant. Priority in time of payment of a certificate of participation in a mortgage could not of itself confer a preferential status of the kind forbidden by the statute. A right to receive the capital of their investment prior to the maturity of the whole mortgage could be enjoyed only while the mortgage was in good standing. When a default was declared the holders of certificates of all maturities would have equal rights in subsequent payments on account of principal. Neither *Tucker* v. *Empire Trust Co.* (242 App. Div. 380) nor *Equitable Trust Co.* v. *Green Star S. S. Corp.* (291 Fed. 650; affd., 297 id. 1008) is authority for a result contrary to that here reached. In each of these cases the payment which was in controversy had been made on account of a specific future installment in respect of which specific rights had been granted. The court held in the *Tucker* case that the indenture evidenced a " clear intention " that particular participants " were entitled to the sums paid prior to such due date on account of that principal installment." In the *Green Star* case the payments in controversy were made into a sinking fund prior to default. The court relied upon the text of the indenture which expressly provided that such payments to the sinking fund were *earmarked* for the payment of bonds and interest accruing at the next succeeding interest date. It was because of this text that the court held that the obligations so maturing were " alone * * * entitled to the fund." No certificate of participation in this mortgage gave in terms any interest in the installment. In actual fact neither issuing company nor participation holder treated the installment as a fund earmarked for the holder. In each of the cited cases the courts were controlled by the text of the indenture there in controversy. Here the text of the participation certificate is of consequence but the terms of the statute are the controlling element. In the case of a sound mortgage in good standing no basis exists for asserting that participants of earlier date have any different lien on the security or have " any prior interest therein." Accordingly the court holds that the objection of illegality in the original purchase based upon the existence of certificates of participation having earlier maturity dates must fail. In this respect the objection is overruled.

The foregoing disposes of objection first except in respect of subdivision c thereof, upon which separate comment ought to be

made. This subdivision asks surcharge because the trustee in his character as an individual or as trustee of some other trust purchased certificates in this same mortgage with maturities prior to December 1, 1933. While the legal question is not affected thereby it should be noted that the trustee on the falling in and collection of such earlier paid participations reinvested at least in part in participations maturing December 1, 1933. Perhaps it ought to be noticed also that the trustee here took the precaution to obtain a separate agreement from the issuing company that irrespective the date of maturity in the certificate it would be repurchased before its due date if the life beneficiary's death occurred before that date. The logic of the discussion respecting the major objection makes the purchase by the trustee of other participations for other trusts wholly lawful. Such purchases have no bearing on the issue here. Accordingly subdivision c of objection first is overruled.

Objection second is overruled on the authority of *Matter of Stupack* (274 N. Y. 198). Objection third was withdrawn upon the hearing. Objection fourth raises issues as to the prudence of the initial investment because of the reliance by the trustee on the guaranteeing company. It is undoubtedly the law that mere representations by a guaranteeing company will not justify an investment otherwise improper. (*Matter of Dalsimer*, 251 App. Div. 385.) In this case the trustee himself had substantial experience in the real estate field. He testified at considerable length concerning his general knowledge of the neighborhood and of the use to which the premises were to be put. He knew the factors that entered into the mortgage risk. If in addition he gave consideration to the representations by a company in good standing with whose officials he was acquainted and whose judgment he respected he is not for that latter reason alone to be surcharged. The record shows that all taxes have been paid on the property, that all interest on the first mortgage (latterly at a reduced rate) has been paid and that the certificate of participation has received its ratable share of the interest. The court finds nothing in the record to support a surcharge for lack of adequate inquiry before the purchase. This requires the overruling of subdivisions a and b of objection fourth. Subdivision c of objection fourth raises the same issue as objection second and is overruled on the authority of the same case. Subdivisions d and e of objection fourth raise the same questions as those disposed of in respect of the first objection and accordingly are overruled. Subdivision f of objection fourth seeks surcharge because the trustee invested approximately half of the principal of the trust in a single investment. Lack of diversification is not basis for surcharge. (*Matter of Balfe*, 245 App. Div. 22.) Accordingly this objection is overruled.

Objection fifth seeks surcharge of the trustee for failing to sell the certificate sometime prior to December 31, 1931. It is asserted that had he sold in that period he would have obtained the face amount of the certificate with the interest thereon. The objection recites that the amortization payments were not paid promptly on the due dates and that the taxes were not paid when due. All of these defaults, it should be noted, occurred after the purchase. The proof shows prompt payment of interest to the trustee by the guaranteeing company. That company was one of high standing. It was under the supervision of the Department of Insurance of the State of New York. It was known generally to live up to its obligations. It was lawfully vested by the participants with the power to service the mortgage. Its guaranties were met throughout the period for which the trustee is here attacked. Since no charge against him is made in respect of his conduct after December 31, 1931, the court finds here no basis for surcharge. Had he made inquiry and found that the installments of principal and of taxes were delayed he would nevertheless have found that the payments were made reasonably soon after their due dates. In respect of the delay which concerned the taxes for 1928 he would have found that the owners had obtained a writ of certiorari to review the assessment and that they had ultimately succeeded in that review and had obtained a material reduction in the tax burden. He would have been confronted with a business question if he had learned any of the facts developed on the hearing. The business question presented itself to the mortgage guaranty company. Its decision was to carry on with the mortgagee. In determining what to do the trustee would have been warranted in considering (a) the value of the underlying security and (b) the value of the guaranty. On this record he might have determined that his investment was safe. No question remains in the mind of the court but that in good faith the trustee determined to hold his participation believing it to be worth par. In retrospect it can be seen that he would have done better to have sold the certificate but we are cautioned that retrospect is not the sound viewpoint when the conduct of trustees respecting investments is concerned. (*Matter of Clark*, 257 N. Y. 132.) The trustee is justified by the results in substantial degree. Any doubt as to the trustee's conduct must be resolved in his favor since his good faith is clear and since the question was one of business judgment in determining not to sell a security validly purchased.

Comment should be made on the business aspect of the argument in favor of surcharge because the premises do not carry

all of its burdens. There was a second mortgage on the property. It was in default, naturally. The fact of that default and of failure to pay interest on that mortgage are presented as cogent reasons for surcharging this trustee. Objectants sought to present evidence that prior to December 31, 1931, an assignment of rents had been made to the second mortgagee. This evidence was rejected as immaterial since the issue then being tried was whether or not the certificate should have been sold prior to that date for what it would bring. The theory of objectants seems to be that if the earnings of the property were insufficient from the owner's viewpoint they were insufficient as well from a mortgagee's viewpoint. Holding that view the objectants urge that unless all taxes were paid promptly and unless all interest and all amortization requirements on the second mortgage as well as on the first mortgage were met promptly the first mortgage was necessarily a doubtful security. Proceeding from that premise, objectants say that the trustee should have sold the participation as soon as he found that any second mortgage payment was in default. Emphasis should again be placed on the fact that all of this proof was taken in relation to the claim of negligence in failing to *sell* the participation. None of it was offered and none of it could have been applicable to the issue respecting the original purchase. When the trustee was chargeable with notice of defaults (assuming, for the sake of the argument of objectants' position, that he had to make inquiry currently) the existence of a second mortgage and of a large investment by a second mortgagee might well have been thought by the trustee to be an advantage to the persons interested in the first mortgage. It is a common experience that owners will protect their supposed equities whether earnings from the property suffice or not (compare *Matter of New York Title & Mortgage Co.*, 277 N. Y. 66, 77), and that second mortgagees will for their own sakes make good the payments necessary on a prior lien. The fact that both an owner and a second mortgagee were here involved could legitimately have been considered by the trustee as a safety factor. More important than either of these was the guaranty of a then solvent and well-regarded mortgage guaranty company. The trustee, as a matter of business judgment, could have concluded that if the property sufficed to cover the charges, such as taxes, which were superior to the first mortgage and sufficed to pay the interest on the first mortgage, it was still the sound thing to hold the participation. Accordingly, objection fifth is overruled.

The rulings heretofore made require the overruling of objections sixth and seventh. Before leave to resign can be given to the

surviving trustee he must bring his account down to date. Schedules should be filed within ten days showing such transactions as have occurred since the closing date of the account here for settlement. Objectants may have five days thereafter within which to file objections to any such transactions. A further hearing will then be held if necessary. Otherwise a decree may be submitted, on notice, construing the will and settling the account in accordance with this decision.