In the Matter of the Probate of the Will of Susan W. Thompson, Deceased.

Surrogate's Court, Monroe County, February 11, 1947.

*Edward H. Lamb* and *Raymond E. Westbury* for William C. Herald, proponent.

*Franklin H. Smith* for Emily S. Grasse and others, contestants.

*C. Norbert Baglin,* special guardian for Earl J. Thompson, an infant, legatee.

WITMER, S. This contested probate proceeding was tried before the court without a jury. The contestants do not claim that the testatrix lacked testamentary capacity or acted under undue influence, but claim only that the will was not executed in accordance with the formalities of the statute. (Decedent Estate Law, § 21.) The will, dated September 20, 1945, is all contained on one side of a white sheet of legal-sized paper, bound in a brown cover bearing the name of the testatrix' attor-

neys, Stephens & McCombs, of Hamilton, Ontario, Canada. In respect of this claim it is not disputed (with any substance) that the testatrix signed her name at the end of the will and that two witnesses likewise signed their names at the end of the will, below an attestation clause. It is also acknowledged that before the witness, Mrs. Wm. C. Faber, signed the will, the testatrix declared the instrument to be her will. The contestants claim (1) that the testatrix failed to declare to the other witness, Carrie Brokaw, that the instrument was her will and (2) that the testatrix did not sign the will until after the witnesses had signed and left, and hence did not subscribe, or acknowledge her subscription of, the will in the presence of each of the witnesses.

The testatrix was a citizen of Canada who had been residing in Rochester, New York, for some years prior to her death, on October 5, 1945. It appears that she had executed prior wills, prepared by her same attorneys, and that there is a prior will in Canada which may be offered for probate if the propounded will fails of proof. The court is advised that the only difference between the prior will and the propounded will is that in the latter a legacy to a brother of the testatrix is omitted and that such brother is the witness who has testified in behalf of the proponent, as well as having consented to this probate. Testatrix' attorney, Mr. Stephens, was not present at the execution of the propounded will; and it appears that no one was present thereat except the signers, and the witnesses were not present at the same time. Upon the trial there was offered in evidence an original letter, Exhibit "A", dated September 19, 1945, by testatrix' attorneys, addressed to her at No. 33 Kenwood Avenue, Rochester, New York, and another letter, Exhibit "B", dated December 11, 1946, by said attorneys, addressed to Raymond E. Westbury, Esq., attorney for the proponent, explaining Exhibit "A" and its presence in the files of Stephens & McCombs. Objection was made to the admission into evidence of these two exhibits upon the grounds that they are "incompetent, irrelevant and immaterial, having nothing whatsoever to do with the ritual of execution of the will", and as to Exhibit "B" "on the further ground that this will does not indicate from what source Stephens' & McCombs received" Exhibit "A". Contestants' counsel specifically stated that he did not question that the two exhibits are genuine. Decision was reserved on the objections, and the exhibits were received subject to being struck out if later deemed inadmissible. (*Matter of Gottschalk,* 167 Misc. 397, 401–402; *In re Ward's Will,* 63 N. Y. S.

2d 125, 128, affd. 271 App. Div. 1053.) It is true that the said exhibits do not show what transpired at the time of the execution of the will. However, they do show what instructions the testatrix' attorney gave to her in reference to how the will should be executed, and from the date on Exhibit " A " it is shown that the will was executed on the very day it was received by the testatrix with the letter. Section 354 of the Civil Practice Act, as amended, permits an attorney, whether or not he was a witness on the will, to testify " as to the preparation and execution of the will ". Obviously, Mr. Stephens could not testify as to the execution of the will, and hence no statement that he might make in a letter concerning such execution would be admissible for that purpose. However, the statute authorizes Mr. Stephens to testify as to the preparation of the will. The exhibits are competent to show the occasion for drawing the will and, I believe, to show the instructions which the attorney gave to the testatrix concerning how it should be executed. These things have a relevancy in the total picture as to what happened at the time of the execution of the will, and tend to support the presumption attending the attestation clause. Accordingly, since no objection was made to the genuineness of the documents, nor to anything specifically except the materiality (as to Exhibit " A ") and as to the source of the return of Exhibit " A " (as to Exhibit " B "), the objections are overruled and the said exhibits are received for the purposes as indicated, except that the last eight words of the second paragraph of Exhibit " B " are excluded. (*Matter of Cardwell*, 176 Misc. 1059, 1060–1061; and see Richardson on Evidence [6th ed.], § 612, and authorities cited.) The body of Exhibit " A " reads as follows: " Mr. Herald brought in your letter of the 15th instant and I have re-drawn your will as directed and enclose same herewith.

" Sign where I have marked in lead pencil in the presence of two witnesses and then have it signed by them where we have indicated. Be careful that neither of the witnesses is mentioned in the will, because though the will would be good they would lose their legacies. However, you will have no trouble in getting two independent witnesses.

" When returning the will to me, you might let me have the addresses of the witnesses so we can get in touch with them if necessary."

At the bottom of the letter, Exhibit " A ", appear the following words written in ink: " The witnesses addresses are both — 33 Kenwood Ave. Rochester 11 — N. York."

The pertinent paragraph of Exhibit " B " reads as follows: .
" I enclose herewith my letter to Miss Thompson dated September 19th, 1945. This was returned to me by Miss Thompson with the executed will. The letter is exactly as sent by me with the exception that the words in writing at the bottom ' The witnesses addresses are both 33 Kenwood Ave. Rochest 11. N. York.' was written in Rochester either by Miss Thompson or under her instructions." The last eight words of this paragraph, to wit, " either by Miss Thompson or under her instructions ", are excluded. Mr. Stephens could testify that Exhibit " A " is in the exact form in which he received it, and that he received it with the propounded will, in an envelope postmarked Rochester, New York, and in effect that is the content of Exhibit " B ". Although he may have known her handwriting, he does not profess to recognize the words written in ink at the bottom of Exhibit " A " as being in the hand of testatrix, and for that reason the above-quoted eight words are excluded as his conclusion. However, the said handwriting on Exhibit " A ", although not offered, is before the court and is received as a part of Exhibit " A ", along with Exhibit " B " (Surrogate's Ct. Act, § 144), because the facts are relevant and admissible, and from all the circumstances the court may properly reach the conclusion volunteered by Mr. Stephens that such writing was made " either by Miss Thompson or under her instructions ".

According to the opening paragraph of the testatrix' will she was a spinster; and she was well along in years. She lived in an apartment across the hall from the two witnesses. The witnesses were a mother and daughter. The former, Carrie Brokaw, was over ninety years of age, and when she was examined herein, six months after the execution of the will, she was in bed at home and very weak. Her daughter, Mrs. Wm. C. Faber, is an active woman, probably in her sixties, and had been a buyer for a large store at Ithaca, New York, for thirty-four years. She was out of her apartment in the afternoon of September 20, 1945, when a Mrs. Ross, employed by the testatrix, knocked at the door and asked her mother, Carrie Brokaw, to step across the hall to see the testatrix. Mrs. Brokaw states that she went to the testatrix' apartment; that the testatrix had the will spread out flat on her writing desk and handed a pen to the witness and asked her to sign, which she did without reading it. In answer to the question whether the testatrix' name was written on the will when this

witness signed, she replied, "I couldn't say", and, again, to the question "Did you see any other writing on it?" she replied, "No, I did not notice anything else."

The witness stated that she had discussed the matter with her daughter since this proceeding began, *but could not remember such conversation,* and added "my memory isn't so very good." She further testified that she remembered no conversation with the testatrix that afternoon, except that the testatrix asked her to sign and did not tell her what it was. This testimony was given after her daughter had testified in court and had discussed the matter with her. In view of the great age and admitted poor memory of this witness, little weight can be attached to such testimony. It is clear that this witness' testimony against the evidence of regularity arising from the attestation clause is very weak and inadequate. Standing alone, in the absence of the other witness, it would afford no basis for even a moment's hesitation in admitting the will to probate. (*Matter of Hock,* 160 Misc. 621, 625; Surrogate's Ct. Act, § 142.)

The second witness, Mrs. William C. Faber, was very positive and assertive in manner. She seemed to resent the fact that the testatrix removed the document from her when she began to read it after having signed. When asked whether she had ever seen the will before, she replied, "Yes, I have", and hastened to add, "I saw this mention (much) of it", indicating the lower quarter of the will. Although her mother said that the will was laid out flat on the desk when she went in, Mrs. Faber testified that the testatrix "said 'I want you to sign this', and she quickly brought it to me." Mrs. Faber asked, "What is this paper I am signing?". The testatrix answered, "It is my will". She testified that her mother's signature was on the instrument, and she had some conversation with the testatrix as to the time when her mother signed and how good her signature was. However, she later testified: "Well, she had this paper on the desk and she said 'I want you to sign this', and so I looked down at it and I said 'what am I signing?' She said 'this is my will.' We had no conversation otherwise than that." She states that she signed the will and then began to read the attestation clause, when the testatrix removed the will. She says that she now knows that testatrix' name was not then on the will because if it were, she, Mrs. Faber, would have remarked about the name "Susan", that also being her first name. On cross-examination by the special guardian, in support of the will, the question was asked in effect if the

mentioned similarity in their first names was the only reason she could recall to satisfy herself that the testatrix had not then signed, and she replied, " No, I did not see it any way. It wasn't there to be seen." She further testified that she told the testatrix, " I don't sign papers without knowing what I am signing." When it was then called to her attention that the testatrix' first name was typewritten in the attestation clause, she testified that she signed the will before reading the clause, and that after she had read " probably the first line or so " of that clause, testatrix removed the will. This clause reads as follows: " SIGNED, PUBLISHED AND DECLARED by the above named Susan Wilhelmina Thompson, testatrix, as and for her last will and testament in the presence of us both present at the same time who at her request and in her presence have hereunto subscribed our names as witnesses." The word " Susan " is in the second line of the clause as typed on the will. On further questioning she said that she only read this clause to the point of the testatrix' name and did not read the name. Mrs. Faber further testified that she knew she was signing *as a witness to the execution of the will by the testatrix.* There are other minor inconsistencies in her testimony. For instance, at one point when asked a question by the special guardian in the form of a statement that the testatrix' name was not on " that part of the paper which you saw? " she replied " That's right. I saw the whole page as far as that is concerned." Immediately other counsel had her clarify her statement and state that she meant only the whole of the bottom quarter of the page.

Assuming that the witness, Mrs. Faber, is honest and well intentioned, her testimony does not have the quality of certainty to cause the court to disregard all of the other evidence that the will was properly executed. For example, if the witness could not see and remember that she had seen the testatrix' name typed in the second line of the attestation clause, which of a certainty *was there,* it is difficult to accept without reservation her statement that the testatrix' signature was not there. This is also considered in the light of her testimony that she did not sign any paper without knowing what she was signing. (See *Matter of Pepoon,* 91 N. Y. 255, 258 *et seq.*)

We do not overlook the authorities cited by the contestants to the effect that to make a valid will it is necessary to comply with the requirements of section 21 of the Decedent Estate Law. (*Lewis* v. *Lewis,* 11 N. Y. 220; *Matter of Simpson,* 211

App. Div. 408; *Matter of Crill*, 124 Misc. 134; *Matter of Koecher*, 151 Misc. 50; and *In re Nast's Will*, 46 N. Y. S. 2d 771.) Each of those cases, however, is distinguishable on its facts from the case at bar.

Here we have a will admittedly valid on its face in all respects, including the signatures of the testatrix and of the witnesses who signed at her request. It even appears that all three signatures were signed with the same pen and ink. The only objections are that it was not published to one witness and was not signed by the testatrix until after both witnesses had signed and left. Against this we have an attestation clause which in the absence of the witnesses is sufficient evidence of due execution, once the signatures are proved. (*Matter of Katz*, 277 N. Y. 470; *Matter of Nelson*, 141 N. Y. 152, 155–156; *Matter of Cardwell*, 176 Misc. 1059, *supra; Matter of Fox*, 175 Misc. 955; *Matter of Hock*, 160 Misc. 621, 625, *supra.*)

In *Matter of Katz* (*supra*, pp. 472–473) the court said: " The will bore an attestation clause. The signatures were the genuine signatures of the testatrix and the witnesses. From that and other testimony in the record the Surrogate would have been justified in deciding that the witnesses who went to the testatrix's home for the express purpose of having the will executed signed it as witnesses at her request.

" ' It is, of course, too late to claim that the facts making due execution must all, or any of them, be established by the concurring testimony of the two subscribing witnesses. Both of those witnesses must be examined, but the will may be established, even in direct opposition to the testimony of both of them. This is too well settled to call for the citation of authorities.' (*Trustees of Theological Seminary* v. *Calhoun* [25 N. Y. 422], *supra*, p. 425.) "

In *Matter of Hock* (*supra*, p. 625) the court said: " Were both of the witnesses to the present instrument dead instead of being merely recalcitrant, it is unquestionable that the court would be under obligation to admit the will to probate on the demonstration here made. (*Matter of Pepoon*, 91 N. Y. 255, 260; *Matter of Corcoran*, 145 App. Div. 129, 135.)

" The contention for a contrary result in the present instance overlooks the recognized and authoritatively asserted cogency of the attestation clause. Since the right of the court to reject and disregard the testimony of a witness is not only inherent in the judicial office but is, in the present connection, expressly contemplated in the enactment (Surr. Ct. Act, § 142; *Wyman*

v. *Wyman*, 118 App. Div. 109, 114; affd., 197 N. Y. 524; *Matter of Cottrell*, 95 id. 329, 333; *Matter of Sizer*, 129 App. Div. 7, 11; affd., 195 N. Y. 528), and the court has determined that the testimony adduced respecting the events of execution is totally unworthy of belief, it follows that the present record as to this phase of the matter is in precisely the same situation as if all evidence on this subject had been eliminated. The effect of the attestation clause as furnishing some evidence in support of the affirmative burden of demonstration of compliance with the statutory requisites thereupon becomes of moment."

Moreover, we have Exhibit " A " which shows the written instructions which the testatrix received with the will from her attorney on the very day it was executed. At least two things in such exhibit should be noted. First, the attorney directed the testatrix to sign where he had marked in lead pencil. A careful examination of the will shows the remains of pencil marks all across the line where the testatrix had signed, and some pencil letters of her name are visible. There is no direct evidence as to when they were erased before the testatrix signed; but the further question arises as to whether the penciled name or the unerased remains thereof were not on the line and visible to the witnesses if the testatrix had not already signed it in its present form. This point casts further doubt upon the testimony of the witnesses to the will. Second, in the last paragraph of Exhibit " A " the attorney asked the testatrix to send him the names of the witnesses. The ink writing at the bottom of Exhibit " A " and the references thereto in Exhibit " B " show how carefully the testatrix read, and, in part at least, followed her attorney's instructions. That is some evidence in support of the attestation clause.

Our courts have admitted wills to probate under circumstances similar to the instant case. (*Matter of Price*, 254 App. Div. 477, affd., 279 N. Y. 700; *Matter of Hohn*, 180 Misc. 384, 387–388; *Matter of Cardwell*, 176 Misc. 1059, *supra; Matter of Hock*, 160 Misc. 621, *supra.*) The only difference between the cited cases and the one at bar is the length of time that elapsed from the execution of the will to the time of probate. Here the time is only six months, which is the strongest point in contestants' case in support of the testimony against the validity of the will. In my opinion the other considerations hereinbefore mentioned overcome this point of time. It is also observed that this department recently held that a slight vari-

ance from the usual formality in the execution of a will, unattended by any other circumstances throwing suspicion on the will, did not render such will invalid. (*Matter of Martin,* 270 App. Div. 875.)

This is a close case which could be decided either way on the facts. I prefer to lean toward the side of practical justice. If there is any reason why this will should not be probated, it is a highly technical one. I have intimated and now hold, upon all of the facts and circumstances before me, that the will was properly executed in strict conformity with the statute. (Decedent Estate Law, § 21; Surrogate's Ct. Act, § 142.) Furthermore, as a practical matter, if this will were not probated, there is a prior one almost identical in terms which may be offered. For the contestants really to win they would have to be successful in contesting that will also. This is a small estate, and by the time such litigation were completed there would be little left for the successful litigants. The will being admittedly genuine and regular on its face, upon the evidence before me I do not care to assume the responsibility for denying probate.

Submit decree for probate.