In the Matter of the Accounting of TITLE GUARANTEE AND TRUST COMPANY et al., as Trustees under the Will of CORNELIUS J. RYAN, Deceased, and WILLIAM F. BROWN, as Ancillary Executor of MICHAEL G. RYAN, Deceased.

Surrogate's Court, New York County, August 24, 1940.

*Fred L. Gross* and *K. Frederick Gross* for Title Guarantee and Trust Company, petitioner.

*Herman Kahn* and *Arthur Rosenbaum* for Alice R. Barry and another, respondents.

*William W. Owens* for Marie U. Kearney and another, respondents.

*Nicholas P. Callaghan* for Ellen R. Lynch, respondent.

*Frank H. Foley* for Ralph S. Daniels, as ancillary committee of Timothy B. Ryan, respondent.

DELEHANTY, S: Deceased died in 1911 leaving a will wherein he provided for his widow, who died in 1912. After her death the entire residuary estate was held in trust for the children of deceased. Each child had only the income on his share until he attained age thirty-five. Then he became entitled to his principal. Three children have already passed thirty-five and the youngest will become thirty-five in 1945. Since November, 1911, Title Guarantee and Trust Company has acted as trustee in all of the trusts. Since 1913 William F. Brown has acted as cotrustee in all of the trusts. In 1914 Michael G.

Ryan qualified also as trustee of all the trusts. He died January 9, 1928, and no successor to him has been appointed.

Intermediate accounts of the three trustees were settled by decrees of the court dated respectively May 31, 1917, May 2, 1922, and January 19, 1928. The account now before the court for settlement covers transactions of the trustees from April 20, 1927, to November 9, 1937, except that the participation of Mr. Ryan in the reported transactions terminated when he died on January 9, 1928. To the account now before the court more than 300 objections have been interposed. As a corollary to their objections and in furtherance thereof the objectants applied to the court to vacate the decrees entered in 1922 and 1928, settling the prior accountings of those periods. These applications are consolidated with the accounting proceeding.

Throughout the life of the trusts the funds have been chiefly invested and are now invested in so-called guaranteed first mortgages and guaranteed first-mortgage certificates. Many of the whole mortgages in the trusts are asserted by the objectants to have been purchased by the trustees from the corporate trustee itself. The individual trustees are charged with having failed in their duties by negligently permitting these unlawful purchases. In respect of the mortgage certificates or participations it is asserted that notice of the purchase thereof was not given as required by subdivision 7 of section 188 of the Banking Law in effect at the time of the respective purchases. Objectants Barry and Hulswit separately attack the validity of certain investments in mortgage certificates for their trusts, on the ground that such certificates carried maturity dates coinciding with the due dates of the balances of principal of the mortgages, whereas, other participations in the same mortgages sold to other persons were made to mature on dates when payments in reduction of mortgage principal became due. These separate objections assert that such certificates bought for the trusts were not equal in lien to the certificates thus sold to others.

In addition to the objections based upon the alleged impropriety of the purchases of whole mortgages by the trustees from one of their number and the objections in respect of the mortgage participations just outlined, there is a broad attack by all objectants upon all the trustees based on various forms of neglect and misconduct in the making of the original mortgage investments, in the managing of the mortgages after the investments therein and particularly in the renewal of the mortgages after they became due. The trustees are charged

with failure to investigate the responsibility of obligors, with failure to give adequate consideration to the earning history of the properties underlying the mortgages bought, with making investments in mortgages on properties which had shown themselves unable to carry prior mortgages in the same amount, with making investments in mortgages on vacant or substantially nonproductive land, with making investments in mortgages on realty not worth at least 50% more than the mortgage principal and with an unwarranted reliance upon the guarantee of the investments by Bond and Mortgage Guarantee Company.

By appropriate objection the further charge is made against the trustees that the actual determination respecting the trust investments was left to the corporate trustee and it is asserted to have been unable to act with fairness to the trusts because it was motivated by a desire to obtain for itself commercial profits from so-called loan fees and renewal fees paid to it by mortgagors whose mortgages were placed in the trusts. In respect of the so-called loan fees, specific attack is made upon the investments on the further ground that the corporate trustee made a profit from the trusts in the amount of such fees when it sold the investments to the trusts at par. In respect of the so-called renewal fees, objectants assert that the corporate trustee was motivated by a desire to make a commercial profit out of mortgagors who sought renewal of loans held by the trusts and so was unable to make a disinterested decision as to whether a particular trust mortgage or participation should be renewed when it became due. In this connection the objections assert that the trustees could and should have required payments at the time various mortgages and participations became due and that demands for payment were not made because the corporate trustee acted in its own behalf so as to secure the renewal fee profits available only if extensions were granted. Various other objections to the account and to the conduct of the trustees are made by objectants. Some relate to capital commissions, some to income commissions, some to so-called expenses of the trust estate listed in the account, some to the form of the account and some to other phases of the administration of the trust. These will be referred to hereafter when the objections are dealt with in detail.

Before proceeding to consideration of those objections which are made by all objectants and which broadly attack the trust investments and the conduct of the trustees, the court will dispose of the separate objection made by Barry and Hulswit

which relates to the alleged defect in the investments made for these trusts consisting of participations in mortgages which required amortization of principal. This sort of objection was discussed by the court in *Matter of Gottschalk* (167 Misc. 397). There the court held unsound the legal theory now advanced by these separate objectants. Objectants ask a reconsideration of the court's views thus expressed and in particular assert that they are entitled to such reconsideration because the text of the participation certificate here in controversy differs from the text which was before the court in *Matter of Gottschalk*. While that difference in text exists, it is unimportant. The very text which is here involved was before the Court of Appeals in *Matter of Nugent* (280 N. Y. 505), and was there held not to furnish basis for the kind of objection now being considered. Objectant's Exhibit 23 in the record on appeal in *Matter of Nugent* and accountants' Exhibit 83 in the present proceeding are identical in form. The mortgage investment which was before the court in *Matter of Nugent* was an investment in a mortgage requiring amortization payments. The printed record on appeal in the *Nugent* case (fols. 671–678) makes it clear that in the mortgage there before the court participation certificates had been issued which had maturity dates contemporaneous with the principal installments required to be paid on the mortgage debt. In the *Nugent* case, as here, the participation owned by the trust had a maturity date identical with the date when the balance in the mortgage was payable. The precise point here made by objectants was there made. In the appellant's brief (pp. 29–36) attack was made upon the certificate as not within the statutes which authorized an investment in a share or part of a mortgage. *Matter of Gottschalk* (*supra*) was referred to at length and the decision asserted to be erroneous. Point VII of the respondent's brief in the Court of Appeals was devoted to the same question. There copious excerpts from the *Gottschalk* case were printed and (together with other cases) it was cited in support of the validity of the investment notwithstanding the difference in maturity dates of the respective participations. Thus the record on appeal and the briefs in the *Nugent* case compel the conclusion that the Court of Appeals has held unsound the separate objection urged only by Barry and Hulswit in respect of these participations. Accordingly on the authority of *Matter of Nugent* (*supra*) and *Matter of Gottschalk* (*supra*) this separate objection is overruled.

Next will be considered the objections to whole mortgages which are based upon alleged self-dealing by the corporate trustee. Objectants seek from the court a direction that the trustees substitute cash for all whole mortgage investments purchased (as objectants assert) by the trustees from the corporate trustee. This relief is sought irrespective of any merit or lack of merit attaching on other grounds to objections to the same investments. In support of this class of objection the vacatur of the 1922 and 1928 decrees is asked so as to avoid any contention of the trustees that such decrees bar the prosecution of the attack now made. In the applications for vacatur of the prior decrees objectants assert that the prior accounts wholly failed to reveal the manner in which the mortgages were acquired and so should not stand as a bar to the objections now made. Detailed comment is made hereafter respecting facts which are relevant to the applications to vacate the decrees. It suffices at this time to say that the court grants the applications so far as is necessary to throw open to decision now all of the objections to the purchases of whole mortgages which are now criticised.

The rule of law that a trustee may not deal with himself is an established standard of trust administration. When self-dealing is discovered the beneficiary has the unqualified right to disaffirm the transaction and to require the return to the trust of the consideration paid. He may require the trustee to make good any damage to the trust after making due allowance for any benefits derived by the beneficiary from the transaction repudiated. The views of the court on transactions of purchase such as are here under attack are stated at length in *Matter of Tuttle* (162 Misc. 286). The authorities on the point are sufficiently discussed there and will not be further discussed here. The law forbidding this type of purchase being certain, the only open question is one of fact. The record here presents a very full and clear development of all the material and relevant facts.

In nearly every instance of investment in a whole mortgage the corporate trustee purported to have made the purchase from Bond and Mortgage Guarantee Company. It asserts that the transaction of purchase was genuinely a purchase from an independent agency and that such a purchase does not fall within the condemnation of the rule. The facts in a particular transaction in the Barry trust will serve to exhibit the actual course of dealing of Title Guarantee and Trust Company with Bond and Mortgage Guarantee Company on the

one hand and of Title Guarantee and Trust Company (Bond and Mortgage Guarantee Company) with the trust estate on the other. In respect of a so-called Rothchild mortgage a trustees' check dated March 28, 1932, for $5,500, to the order of Bond and Mortgage Guarantee Company, was put in evidence. The cash book of Bond and Mortgage Guarantee Company was examined and the supposed payment of this sum to Bond and Mortgage Guarantee Company was not found recorded among the cash receipts of that company. It was conceded by the accounting corporate trustee that this check was not deposited at all by Bond and Mortgage Guarantee Company, but was endorsed over to Title Guarantee and Trust Company which collected the proceeds. The records of Bond and Mortgage Guarantee Company in respect of investments made by it were examined and such examination disclosed that no entry was made in its records of the acquisition of a Rothchild mortgage. An officer of the Title Guarantee and Trust Company was then asked to produce the cash book of the corporate trustee (which concededly had been the original owner of the $5,500 Rothchild mortgage) and he was asked to show the record of the sale of that mortgage to Bond and Mortgage Guarantee Company. He stated that the cash book of Title Guarantee and Trust Company showed no receipt from Bond and Mortgage Guarantee Company of any payment for that mortgage by Bond and Mortgage Guarantee Company. When asked to exhibit the entry in the corporate trustee's books respecting the receipt of money for this mortgage *from any source,* he testified that the only entry on the subject was as follows: "Mortgage No. 370304, Title Co., Ryan-Rothchild, $5,500." Thus the proof showed that the only actual transfer of money was a transfer of money out of the Ryan trust estate (the trust for Barry) to Title Guarantee and Trust Company. No money ever went into Bond and Mortgage Guarantee Company's funds from the trust. The transfer of the mortgage was a transfer from the corporate trustee in its corporate character to the trust of which it was trustee. The method of transfer of funds just outlined and the lack of entries either of cash receipts or of purchase of the Rothchild mortgage in the books of Bond and Mortgage Guarantee Company are conceded to be typical of the handling of the whole mortgage investments in the trusts. The corporate trustee insists that, notwithstanding the facts just outlined, the transaction was nevertheless a *bona fide* sale by it in its corporate character to Bond and Mortgage Guarantee Company and a resale by the latter company to the trust.

The corporate trustee asserts that the procedure followed by it was designed so as to procure the guarantee of the Bond and Mortgage Guarantee Company. It points to the existence of unrecorded assignments running first from the corporate trustee in its corporate character to Bond and Mortgage Guarantee Company and second from the latter to the trustees as proof that the transaction was truly a genuine sale. While the corporate trustee asserts that a sale was necessary for the procurement of the guarantee, the record proof is to the contrary. As early as 1913 mortgage guarantee companies were authorized to guarantee or insure payment of bonds and mortgages. Such corporations were not required to buy a mortgage in order validly to guarantee its payment. Indeed, the fact that such a guarantee was made by Bond and Mortgage Guarantee Company without owning the mortgage is shown by the trust transactions in participations. The statute permitted participations to be made directly by the corporate trustee to the trusts. It put into the trusts participations in mortgages owned by itself and guaranteed by Bond and Mortgage Guarantee Company. Thus the record shows that the purported sale to Bond and Mortgage Guarantee Company was not an essential step in procurement of the guarantee.

The court holds that in the typical case described no transfer of title to the mortgage was made in fact to Bond and Mortgage Guarantee Company and so holds that the actual transfer was one made directly by the corporate trustee to the trust. This ruling suffices to charge the corporate trustee with the obligation to replace in the capital of the trust all of the moneys invested in the purchase of whole mortgages which were thus ostensibly routed into the trust through Bond and Mortgage Guarantee Company.

A wholly separate reason for reaching the same result was outlined in a measure by this court in *Matter of Tuttle* (162 Misc. 286, *supra*). In the present record, however, a great many factors have been developed which were not known to the court when *Matter of Tuttle* was considered. These should be summarized since the aggregate effect of all of them is to establish an identity between the corporate trustee and Bond and Mortgage Guarantee Company in respect of mortgage transactions and thus to establish a further and wholly independent basis upon which the objections now under consideration must be sustained. In substantial though not in controlling degree share ownership of the corporate trustee and of the Bond and Mortgage Guarantee Company was in the same

hands. High ranking officers of one company occupied comparable offices in the other. A single individual acted as the controller of both companies during the last thirteen years of the existence of Bond and Mortgage Guarantee Company. A single individual was the real estate officer of both companies. The corporations had common or adjacent offices. They had a single bookkeeping and a single auditing department. They conducted their sales departments as a joint enterprise. They operated an appraisal department as a joint enterprise. They shared certain expenses and made common purchases of supplies. They participated in renewal fees. They emphasized truly in their advertisements that the two companies were " associated " and " allied." Thus the interrelations of the two corporations shown in the record are so close as to require the court to rule that there did not exist between them that independence of operation which alone would have validated a purchase of investments for these trusts from Bond and Mortgage Guarantee Company. As was said in *Matter of Tuttle* (*supra*), the process of lending on mortgages by the corporate trustee, of sale of such mortgages, of reconstitution thereby of its loan funds and of reinvestment thereof was so continuous and was so bound up with the operations of the Bond and Mortgage Guarantee Company that the statutory bar against self-trading by a trustee must be held to be applicable to any acquisitions by the trusts even of mortgages genuinely owned by Bond and Mortgage Guarantee Company.

Transactions of purchase of whole mortgages which are thus condemned in principle by the court took place during periods covered by the decrees on the earlier accountings. The court has noted briefly its granting of the applications to open such decrees. It may well be that no formal opening of the decrees is required to reach the transactions here criticised (*Matter of Denbosky*, 245 App. Div. 93, 95) because the schedules in the former accountings did not adequately reveal the facts now established. A typical illustration will suffice to exhibit the defects in the prior accounting schedules. In the C. J. Ryan trust there was a so-called Curti mortgage for $6,750. According to the stipulation of fact this mortgage was assigned by the corporate trustee to Bond and Mortgage Guarantee Company on November 24, 1925, and on the same date reassigned by the latter company to the trust. The information concerning this mortgage which was reported in the last account is contained in schedule I-4 of the former account. Therein are **reported the investments** outstanding at the beginning date of

the accounting period, October 20, 1921, the investments purchased during the accounting period, the investments collected or sold and the manner in which the balance in the trust was invested at the close of the accounting period. Opposite the date December 8, 1925, in this schedule there is reported the purchase of "Bd. & Mtge." of a mortgagor named Curti at a cost of $6,750. The later schedule of the investments on hand shows the same entry. It is quite apparent that such an entry made no disclosure of the underlying self-dealing of the corporate trustee. The court holds the disclosures in the prior schedules inadequate and holds that notwithstanding the former decrees it may make inquiry now as to these purchases.

It is essential now to consider the further defense of the accounting trustees which is based upon releases procured from the respective trust beneficiaries when they respectively attained majority. At once it should be noted that these releases are only receipts for income which had accumulated during minority. They do not purport to deal with the principals of the trusts. It is true that they are accompanied by statements of income which included disclosure of principal assets upon which the income had been earned. They revealed certainly no more than did the accounting schedules to which reference has already been made. They revealed nothing of the fact of self-dealing on the part of the corporate trustee. Such releases of course are valid as a bar to further inquiry only if signed after full disclosure of all material facts. That disclosure was not made and so the releases do not furnish any barrier to the prosecution of the objections.

The trustees urge further that irrespective the releases the beneficiaries knew for many years of the actual course of dealing of the corporate trustee and so by acquiescence and laches are now estopped to raise issue as to those transactions. In support of this position they offer correspondence with a firm of Pennsylvania lawyers representing the beneficiaries. Typical of this proof is Accountants' Exhibit 48 written by the attorneys for Alice Julia Ryan. The letter says in part: "We note that the assignments to the various parties from the Title Guarantee and Trust Company, the original holder of the mortgages, are unrecorded. I assume that the purpose of having the assignments unrecorded is for the convenience of the Title Guarantee and Trust Company in looking after and handling these mortgages."

The trustees call attention also to the securities receipted for by the beneficiaries when they were paid their accumulated

income. Such payments were made partly in mortgage certificates and partly in whole mortgages. The court is asked by the trustees to note that the receipt describes the whole mortgages as having been made by various mortgagors to the corporate trustee, then assigned by the latter to Bond and Mortgage Guarantee Company, and then assigned by Bond and Mortgage Guarantee Company to the trustees. The trustees also call attention to letters to it from the trust beneficiaries, speaking of the guarantee and inquiring as to what steps the trustee was taking to enforce it. This is not the whole of the proof relied upon by the trustees but it sufficiently outlines such proof. On the basis of it the court is asked to find that the parties knew of the practice of the corporate trustee to sell its own whole mortgages to the respective trusts through Bond and Mortgage Guarantee Company. The court finds on the contrary that the beneficiaries and the Pennsylvania lawyers were equally in the dark as to the self-dealing of the corporate trustee. The whole tenor of the documents signed by the beneficiaries and the letters written by or for them indicates a belief on their part and on the part of their lawyers that Bond and Mortgage Guarantee Company was wholly independent of the corporate trustee. No candid consideration of the proof thus presented can find in it any revelation of the underlying facts which alone would have protected the trustees against the criticism now made. Nowhere is there found that full disclosure which the law requires for protection of the trustee. Note should be made perhaps of the fact that the trustees' proof at the maximum falls far short of showing knowledge by the respective beneficiaries of each of these transactions of self-dealing. Only such complete proof in respect of *each transaction* would avail the corporate trustee. Lacking such proof in respect of any particular transaction, that transaction must be reversed on the demand of the beneficiary notwithstanding the fact that there might be an estoppel of the beneficiary as to other transactions.

The commentary heretofore has been limited to the relations between the corporate trustee and Bond and Mortgage Guarantee Company. Some of the whole mortgage instruments were routed through other corporations either wholly owned or controlled by one or the other or both of the corporations already mentioned. The same principle of decision applies to such whole mortgages. Detailed comment thereon will not be made.

Passing from the subject of whole mortgages to participations in mortgages or mortgage certificates, note should be made of the application by the ancillary committee of T. Burke Ryan for a reopening of the last two decrees on accounting on a ground not urged by other objectants. In respect of participations or certificates this objectant asks vacatur of the former decrees because the trustees made available to the general public participations in mortgages which were partly owned by the trusts. The fact that the trust or these and other trusts did not own all of the participations seems to the court to furnish no ground for criticism and so no ground for relief. This separate ground for vacatur urged by this objectant is held to be without substance.

Consideration must now be given to the objections which assert insufficiency of notice of the purchase of mortgage participations. Subdivision 7 of section 188 of the Banking Law (amd. L. 1917, ch. 385) provided at the times now pertinent that after making such an investment the banking institution " shall promptly notify each person of full age and sound mind entitled to the income therefrom of the fact that such investment has been made." The text quoted refers to the authority given to a corporate trustee to make a trust investment in " a part interest in a bond and mortgage ". The notice required by the statute is of course a notice that such a *part* interest has been acquired as an investment of the trust. The objections assert defects in the respective notices which must of necessity be dealt with in the later detailed rulings made on specific objections. Some general discussion of the objections based on the notice requirement is appropriate. In many cases the notice is alleged to have been too long delayed to meet the requirement of prompt notice. In some cases the **only** notice claimed by the trustees to have been given was a reference in an annual statement of investments on hand to the investment in a share in a mortgage. Objectants point out that some of the so-called notices referred to the investments as investments in bonds and mortgages only and not in parts thereof. The objectants complain of other notices which refer only to " gtd. ctf." in describing the investments. They complain of some instances in which the so-called notice referred to the investment as " mortgage " without any declaration that a participation only was purchased. They assert that in other instances where the word " certificate " was used it was not accompanied by any declaration that only a part share had been purchased.

Detailed study of the records on appeal in cases which have considered the sufficiency of notices of investments in parts or shares of mortgages discloses some irreconcilable divergencies. But the authorities seem to justify the following general statements:

1. Complete failure to give a notice will result in surcharge of the trustee. (*Matter of Heermance,* 254 App. Div. 685, affd. *sub nom. Matter of Prime,* 278 N. Y. 601; *Matter of Bearns,* 251 App. Div. 222, affd. 276 N. Y. 590; *Matter of Gerbereux,* 249 App. Div. 751, affd. 274 N. Y. 495; *Matter of Dimond,* 163 Misc. 611; *Matter of Peene,* 155 Misc. 155.)

2. No fixed form of words is required. (*Matter of Heermance, supra.*)

3. A notice which describes a part interest as a bond and mortgage is insufficient. The notice must show expressly that the investment is in a part interest or share. (*Matter of Roche,* 245 App. Div. 192; *Matter of Dimond, supra.*)

4. The notice goes to the *legality* of the investment and either failure to give it or a substantial defect in it requires surcharge. (*Matter of Peene, supra; Matter of Dimond, supra; Matter of Roche, supra; Matter of Bearns, supra; Matter of Gerbereux, supra; Matter of Heermance, supra; Matter of Jones,* 155 Misc. 315.)

5. The notice must be given with reasonable promptness. What is reasonable seems to depend upon the surrounding circumstances in each case. (*Matter of Nugent,* 280 N. Y. 505, *supra.*)

6. The beneficiary is not required to show loss traceable to the failure to give notice. Even proof by the trustee that the loss was due to causes other than such failure will not save him from surcharge. (*Matter of Bearns, supra; Matter of Peene, supra.*) In *Matter of Bearns* the Court of Appeals received many briefs *amicus curiae* and rejected vigorously urged views which sought refusal of surcharge unless causal connection was shown between the damage and the lack of notice. It should be noted, too, that it was vainly argued in *Matter of Bearns* that the statutory authority given by section 111 of the Decedent Estate Law and by section 21 of the Personal Property Law validated the investments despite lack of compliance with the Banking Law.

It is against these standards that the liability of the trustees must be measured. The practice of the corporate trustee here was to issue to the income beneficiaries a quarterly income statement and to give them annually a statement of the princi-

pal assets in their respective trusts. In view of the authorities cited above and having in mind the practice of sending quarterly statements to the beneficiaries, the court holds that a notice (if otherwise sufficient) given by a quarterly statement next after the purchase of the part or share in the mortgage was given in time. In *Matter of Nugent* (280 N. Y. 505, *supra*) the acquisition occurred on November 8, 1928, and the notice was not given to the beneficiary until February 11, 1929. In the case here for decision a delay of three months would have to be validated under the *Nugent* case if it were not for the fact that the quarterly statements furnished the opportunity for the giving of the notice. The income statements thus supplied reported the income on the new investment so far as it was received. It was the practice of the trustees to show on the quarterly statements acquisitions during the prior three-month period. So, under the practice of the trustees it was essential that they should, in the first quarterly statement rendered after the acquisition, report the fact to the beneficiary. In every instance where such acquisition was not so reported the court holds the notice insufficient and as matter of law holds the corporate trustee liable to surcharge for the amount invested in the participation.

Since it was the practice of the trustees to send an annual statement of investments on hand and since sometimes there was variance between the form of reference to the new acquisition given in the quarterly statement and that given in the annual statement, the court holds that the description in the quarterly statement controls and that any defect therein is not cured by what otherwise would have been a proper description in the annual statement. The notice under the statute is a *single* notice and not a composite one. It is essential to the validity of the investment and it must stand or fall on its quality when first given. Later transactions may operate to effect an estoppel of the beneficiary to urge the point, but when *actual* compliance with the statute is asserted the notice first given must answer to the legal requirements. The reasons for the strictness of the rules worked out in the authorities cited above were cogently stated by Mr. Surrogate SLATER in *Matter of Peene* (155 Misc. 155, *supra*) and need no further exposition. His views have been adopted by the Appellate Division and by the Court of Appeals except perhaps as to the requirement of *immediate* notice. The court holds that a notice which refers to the new acquisition as that of a bond and mortgage is misleading and inaccurate and hence

insufficient as matter of law. The court holds that a notice which refers to the new acquisition as a mortgage only is insufficient if in the same notice there is no reference to participations, but is to be regarded as sufficient if the instrument of notification in its other text deals with participations or part shares in mortgages and thus indicates that the "mortgage" is a share only. Later in this opinion detailed rulings are made respecting the sufficiency of the notice as to individual investments.

[At this point and at later points indicated by asterisks other material included in the opinion of the Surrogate is omitted because of its subordinate importance.]

A further topic which admits of general treatment is that of the guarantees given by Bond and Mortgage Guarantee Company. It has already been noted that this company and the corporate trustee had a common accounting and auditing staff. The factors which currently affected the worth of the guarantee were known contemporaneously to the corporate trustee. When therefore in July, 1931, the guarantee company declined to make principal payments on guaranteed mortgages and certificates then coming due because of defaults or of maturities, the corporate trustee was at once on notice. When thereafter there occurred the great increases in unpaid principal liabilities in respect of which the guarantee company (contrary to prior practice) had taken advantage of the eighteen months' grace period, the corporate trustee could no longer say validly that the guarantee was an assurance of safety. And when the account of real property acquired by the guarantee company in foreclosure (carried on its books not at real worth but at asset values equal to the original mortgage plus all accruals of taxes and interest and plus all acquisition costs) rose to unprecedented heights while the cash resources steadily shrank, it was apparent to the corporate trustee that the guarantee was substantially worthless. By July, 1932, the facts known to the corporate trustee made any reliance on the guarantee a violation of the trustee's duty. Any renewal made after July 1, 1932, must be justified, if at all, by the property and its history theretofore, disregarding the guarantee.

* * * * * * *

* * * The court agrees with objectant [Marie Ursula Ryan Kearney] in her criticism of the management agreement. That agreement surrendered rights which the trustee should have retained but the making of the agreement did not affect the *legality* of the investment; and since its making is not shown to have caused a loss no surcharge can be made for this reason.

* * * * * * *

In respect of the individual trustees the court finds no such malfeasance or misfeasance as warrants surcharge of either. They had confidence in the corporate trustee. They could have had no more access to the records of the interrelated companies than the general public. They are not shown to have known of the self-dealing of the corporate trustee. The difficulties confronting realty managers generally during this accounting period were experienced by these trustees. No deliberate fault of the individual trustees is shown nor any personal gain by them. No surcharge will be imposed on them. In denying the request of objectants that the individual trustees be surcharged the court has not passed upon their right to receive commissions nor passed upon the question whether their derelictions or inactivities as trustees warrant denial of commissions to them in whole or in part. All of those questions have been reserved for further hearing when the decree is noticed for settlement.

\*    \*    \*    \*    \*    \*    \*

The question was raised originally by certain of the objections to the account respecting the amounts paid for counsel fees. These objections were ultimately withdrawn on the understanding that objectants would oppose any further payments of counsel fees by the trustees in relation to the present accounting and that the trustees and their counsel reserved the right to claim further compensation. While the proceeding was in progress certain payments were made by the trustees out of the capitals of the trusts to counsel representing them on this accounting. Since such payments were made concededly for services on the accounting, the court deems the subject matter of such payments to be within the purview of the present proceeding even though the payments were made at a date subsequent to the closing date of the period accounted for. In view of the court's conclusions respecting the merits of the objections, the court must hold that further payments to counsel made by the trustees in an effort to avoid surcharge constitute an unwarranted burden upon the trusts. Formal applications to require refunds to certain trusts of money so paid to counsel have been consolidated with this accounting proceeding. The court grants the applications so far as they were not withdrawn, and directs the reimbursement by the trustees to the respective trust funds of the amounts withdrawn therefrom and paid to their counsel for services on this accounting. Since the court has reserved to a further hearing on the settlement of the decree the question of the extent, if any, to

which commissions will be allowed, it is appropriate that there should also be reserved the question whether any costs will be allowed to the trustees on the account. The court will permit counsel for the trustees and the trustees to present a bill of costs pursuant to statute and will consider such bill and any objections thereto prior to the entry of the decree herein.

(Supplemental opinion, October 22, 1940.)

\* \* \* \* \* \* \*

A second ground of objection to commissions is raised by Hulswit objection 68, Barry objection 55 and (perhaps) T. B. Ryan Committee objection 45. These assert that the commissions on income have been computed erroneously because based on annual rests. These objectants assert that the commissions should be computed on the entire income as a single fund. If so computed the commissions would be materially reduced. The court holds that the form of quarterly and annual reports made by the trustees to the respective beneficiaries sufficiently conformed to the requirements of the statute so as to entitle the trustees to compute their commissions on an annual rest basis. Accordingly these objections are overruled.

\* \* \* \* \* \* \*

\* \* \* The court has ruled in the main decision that the corporate trustee is required to make good to the trust a very substantial sum of money both in principal and in income account. Insofar as the commissions on income are concerned, they represent in the case of each trustee compensation for the actual rendition of services over the period accounted for. In the case of the individual trustee, he will be permitted to keep the income commissions which he has actually received. Since the directed surcharges will produce additional income in respect of which the individual trustee has rendered no service and since such additional income is derived solely from the beneficiaries' own efforts to enforce rights which were threatened with loss by the negligence of the individual trustee, he will not be permitted any income commissions on the income so produced. In respect of the individual trustee there is presented at the moment only the further question whether he is entitled to principal paying-out commissions on the corpus of the trust for Ellen Ryan Lynch. Substantial capital surcharges have been made for her benefit. The individual trustee was derelict and inactive in his protection of the principal values of this and the other trusts. His exoneration from surcharge was granted by the court with some reluctance. The court regards his derelictions as sufficient to warrant denial to him of principal paying-out com-

missions. This ruling is made only in respect of the Ellen Ryan Lynch trust since that is the only one in connection with which the issue has arisen during the period of this accounting.

In respect of the corporate trustee the court will pursue a policy which has been frequently followed in this court. As to this trustee it will allow commissions for paying out the principal of the trust for Ellen Ryan Lynch and will allow income commissions on the income produced by the surcharges but will credit such commissions only as a final means of completing payment of the surcharges themselves. Since the allowance of commissions in this form presupposes that the trusts have been reconstituted fully as to capital and that the appropriate earnings on a trust capital properly administered are available to the beneficiaries, there may properly be allowed to the fiduciary who thus has made good its liability the same commissions which would have been payable to it had the reconstitution of the trust not have become necessary.

A further question which remains for decision on the subject of commissions concerns itself with the withdrawal by the trustees of so-called normal commissions on the gross rents received out of the so-called 42nd Street property from 1933 to 1936. This is the property which was taken over in a salvage operation in the year 1933. From the date of its acquisition it has operated at a deficit in every year. It is impossible to ascertain from the accounting schedules whether or not normal commissions were in fact charged on gross rents, but the trustees by an affidavit filed October 18, 1940, have stipulated to the effect that such commissions were taken during three years ending in 1936. They now ask that their withdrawal of these commissions be validated and that the right on their part to the taking of two normal commissions on gross rents for the period post 1936 and to the end of the accounting period be also established. The property from which the rents were derived was in a salvage operation. The rules respecting this type of operation are stated in *Matter of Chapal* (269 N. Y. 464) and *Matter of Otis* (276 N. Y. 101). Under these rules all transactions of income and outgo are to be dealt with in principal account until the time arrives at which a net sum is available for income distribution after all principal advances in the salvage operation have been repaid. The general rule respecting the allowance of commissions is stated in *Beard* v. *Beard* (140 N. Y. 260). In that case it was stated explicitly that no commissions are allowable either as principal or income commissions on what are investments and reinvestments of capital. In a salvage operation all of the proceeds of the

realty (which is merely the substitute for the mortgage) are to be deemed investments and reinvestments until an actual net income is produced. It is only on the latter that income commissions are collectible. For this reason the commissions already taken by the trustees were improperly taken and they are respectively surcharged therewith. The demand for commissions for the period post 1936 is held to be without basis.

The final question which remains for determination concerns itself with the rate of interest on surcharges to be paid by the corporate trustee. The rule for the interest penalty payable by a trustee is stated in *King* v. *Talbot* (40 N. Y. 76, 95) where it is said: " Where the failure of a trustee in his duty is wilful, or characterized by bad faith, the highest rate of interest should be imposed. But where good faith and honest mistake concur, the rate of interest rests in a discretion, that permits the consideration of all the circumstances, which show that substantial justice can be done to the *cestui que trust,* by allowing a less rate. Hence, in such case, we may not close our eyes to the fact, that in a long course of years, such as are now under consideration, there are periods in which it is impracticable to realize on investments, which give the requisite assurance of safety, the highest interest allowed by law. That loans, for long periods, will rarely be taken, on such security, at the highest rate. That, in a commercial community like our own, fluctuations are frequent and large, and especially, that in the management of funds of considerable amount there must necessarily be intervals when funds lie idle, seeking investment, notwithstanding all reasonable diligence on the part of the trustees."

The Restatement of the Law of Trusts (§ 207) says in part: " If the breach of trust consists in an improper sale of trust property or an improper purchase of property for the trust, the trustee is chargeable with interest at the current rate of return on trust investments, unless the breach of trust was intentionally committed, in which case he is ordinarily chargeable with interest at the legal rate."

An informal discussion of the question of liability for interest is found in 37 A. L. R. 447, 55 A. L. R. 950 and 112 A. L. R. 833.

Except in the instances which are hereinafter particularized, the court has not found that there existed on the part of this corporate trustee such bad faith or malice or misuse of trust property as to invoke the penalty of interest at the legal rate. The parties (without surrendering their respective legal positions on the subject of liability for interest) have stipulated that the average rate of return on trust investments for the

period from January 1, 1933, to August 31, 1940, shall be deemed to have been 4% per annum. The beginning date stated in the stipulation has been selected because antecedent that date the actual return on the investments was in excess of the stipulated 4% rate. The rule respecting the trustee's liability for actual income receipts by him is summarized in the Restatement (§ 207) thus: "*a. Interest received.* The trustee is chargeable with any interest actually received by him on trust funds, although the amount received is greater than the legal rate or the current rate of return on trust investments." While the trustee here is surcharged with certain investments made antecedent January 1, 1933, and is required to replace in principal account in cash the amounts disbursed in the making of such investments, the actual earnings on the investments while they were held belonged to the beneficiaries. The trustee cannot ask to have the excess over 4% received in the earlier period credited to the later period when the actual return on the improper investments was less than the 4% rate stipulated. The computation of interest surcharge is to be made on the basis that so long as the amount actually received on the improper investments equaled or exceeded 4% per annum the beneficiary is to have the benefit of the actual rate of return. For any interval during which any investment held to be invalid actually produced less than the 4% rate the trustee is surcharged with interest at such rate but is entitled to a credit against such surcharge of the amount of interest actually received. The commissions credit is dealt with hereinabove. This interest is to be computed on a simple-interest basis and not compounded.

\* \* \* \* \* \* \*

(Supplemental opinion, January 2, 1941.)

The attorneys for successful objectants in this accounting proceeding seek to have fixed counsel fees or costs or both and to have the amount thereof charged to the corporate trustee or to both trustees. The court is asked by the applicants to exercise the power resident in it under special circumstances to make whole the successful parties by such a charge against the trustees personally. While special circumstances may justify an allowance of counsel fees to a successful party and may justify a charge of such allowance against another party in a proceeding in this court, the court does not deem the present accounting proceeding one in which such power should be exercised. There is here accounted for a very substantial body of investments in property, in respect of many

of which objections were filed by the respective beneficiaries of the trusts in which the investments were made. The volume of investments and the nature of them resulted in there being filed a great volume of objections. Because of the questions presented by the objections a very substantial body of investigation was required and eventually a large body of proof was taken by stipulation and otherwise. The court does not deem this aggregate of facts to constitute sufficient basis for the exercise of its power in a proper case to allow counsel fees as well as costs to successful objectants. It believes and holds that proper relief may be given to objectants by making to them or to their attorneys cost allowances in accordance with the usual practice of the court in accounting proceedings. Accordingly, the applications so far as they seek the allowance of counsel fees as a charge to the trustees personally are dealt with by the court as the equivalent of cost applications and are ruled upon in that sense only.

\* \* \* \* \* \* \*

The court has also taken into account the fact that a very large body of objections was sustained but that the trustees successfully resisted the attack upon them in respect of other challenged investments. In reaching the result hereafter stated, due allowance has been made for this factor.

\* \* \* \* \* \* \*

These costs are directed to be paid to the respective attorneys for the respective beneficiaries. The respective amounts thereof are charged to the corporate trustee as an addition to the surcharge against it. The court has by its main decision exonerated the individual living trustee and the now deceased trustee from personal liability for the surcharges. Since the main decision puts the responsibility for refund to the estate upon the corporate trustee, it is appropriate that the liability for costs should be limited to such trustee.

\* \* \* \* \* \* \*

It is appropriate now that a decree settling the account pursuant to this and the prior rulings of the court should be submitted.