6 N.J. Super. 196 (1950)
70 A.2d 784
LIBERTY TITLE AND TRUST COMPANY, TRUSTEE UNDER THE WILL OF GUSTAVUS C. SEIDEL, DECEASED, PLAINTIFF-APPELLANT,
v.
LOUISE PLEWS, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 14, 1949.
Decided January 17, 1950.
*201 Before Judges JACOBS, DONGES and BIGELOW.
Mr. Allen B. Endicott, Jr., argued the cause for the appellant (Messrs. Starr, Summerill & Davis, attorneys).
Mr. William Elmer Brown, Jr., argued the cause for the respondent, Louise Plews (Mr. Charles C. Babcock, attorney for Lillian Welzel, et al.).
Mr. Augustine A. Repetto argued the cause for Joseph W. Wells, et al. (Messrs. Bolte & Repetto, attorneys).
The opinion of the court was delivered by JACOBS, S.J.A.D.
This is an appeal by the plaintiff trustee from a judgment reopening a decree entered on December *202 24, 1932, in the Orphans' Court of Atlantic County and surcharging the trustee for the reasons set forth in the full opinion filed by the lower Court and reported in Liberty Title and Trust Company v. Plews, 142 N.J. Eq. 493 (Ch. 1948).
The decedent, Gustavus C. Seidel, died in 1922. In his will he created a trust in the sum of $250,000, the income to be paid to his widow for life and, upon her death, the sum of $150,000 to be paid to her appointees and the remainder to become part of his residuary estate. He designated, as trustee, the plaintiff trust company which conducted a general banking business in Philadelphia and maintained a trust department, represented to be specially equipped to handle trust estates. On September 26, 1923, the trust was established, consisting of cash, corporate stock and mortgages including shares of the Union Traction Company and the Electric and Peoples Traction Company and a $6,500 mortgage on premises located at 332-34 North Second Street and designated as No. 15 in the lower Court's opinion. Thereafter, the trust was administered and in 1932 the trustee filed its first intermediate account. The schedule of securities attached to this account listed the Traction Company stocks and mortgage No. 15, as well as a "Certificate" in the sum of $8,300. In addition, it listed a group of new mortgages which are described in the lower Court's opinion as Nos. 1 to 14, inclusive, and Nos. 16 and 17. The account simply embodied street address and amount for each of these mortgages but contained no other descriptive information. Exceptions to the account were filed by the life tenant, who contended that she was entitled to certain profits which had been added to the corpus, and by Louise Plews, a remainderman, who contended that the inventory value of the mortgages and other securities listed in the schedule was not a true and correct estimate. At the hearing before Judge Corio in the Orphans' Court, counsel for Louise Plews sought to introduce evidence as to the value of the mortgaged property but the Court declined to permit this in the absence of any default under the mortgages. No issues of self-dealing, self-interest, private profit taking or *203 related wrongdoing were raised either in the exceptions or at the hearing. On December 24, 1932, the Orphans' Court entered its decree which sustained, in part, the life tenant's claim that she was entitled to a sum which had been added to corpus and dismissed the exceptions filed by Louise Plews.
The life tenant died on May 15, 1944, and the trustee filed its final account in the Orphans' Court of Atlantic County on February 6, 1945. Exceptions to this account were filed by Louise Plews and other beneficiaries. These exceptions charged that the trustee had been guilty of self-dealing, self-interest and private profit taking, had made illegal investments and had improperly managed the trust. At the hearing before Judge Haneman in the Orphans' Court a preliminary issue was presented as to whether the exceptants would be permitted to introduce evidence of alleged wrongdoings prior to the 1932 decree. The exceptants contended that the decree should be reopened to permit such evidence, whereas the trustee contended that the doctrines of res judicata, estoppel and acquiescence should be invoked to preclude such evidence. After taking testimony the Court expressed the view that the circumstances did not justify the application of the doctrines advanced by the trustee and ruled that evidence of occurrences prior to 1932 would be permitted. After the hearing was completed and briefs were filed, Judge Haneman was appointed to the Court of Chancery and, with the consent of all the parties, the matter was transferred to that Court for determination. On June 10, 1949, judgment was entered in the Chancery Division opening the decree of December 24, 1932, and surcharging the trustee. The trustee appeals from the entire judgment and a cross-appeal from a minor portion thereof is taken by certain exceptants.

I.

RES JUDICATA, ESTOPPEL AND ACQUIESCENCE.
The first contention advanced by the trustee is that the 1932 decree of the Orphans' Court is res judicata and bars the exceptants from asserting that the trustee had been *204 guilty of self-dealing, self-interest, private profit taking and related wrongdoings prior thereto. It is not disputed that the 1932 proceeding did not in any wise deal with such alleged conduct and that there was nothing in the 1932 accounting which afforded notice to the exceptants thereof. Courts throughout the country have recognized that, although decrees on accounts by trustees may well be deemed to bind cestuis as to all matters which ought be apparent to them from the face of the account, they should not be obliged to conduct investigations and ferret out concealed or missing information under penalty of estoppel. See In re Enger's Will, 225 Minn. 229, 30 N.W.2d 694 (Sup. Ct. 1948); In re Cosgrove's Will, 236 Wis. 554, 295 N.W. 784 (Sup. Ct. 1941); In re Ryan's Will, 291 N.Y. 376, 52 N.E.2d 909 (Ct. of App. 1943); and cases collected in 4 Bogert, Trust and Trustees, pp. 344-349. Similarly, in In re Shaw, 122 N.J. Eq. 536, 543 (Prerog. 1937), Vice-Ordinary Fielder expressed the generally accepted view that the fiduciary relationship betwen trustee and cestui requires that before a cestui is estopped from complaining about a breach of trust it should appear that he "knew all the facts, understood his legal rights and acted deliberately in not objecting to an investment he knew, or should have known, he had the right to object to."
The trustee contends, however, that, notwithstanding the foregoing, the decisions in Pollack v. Bowman, 139 N.J. Eq. 47 (E. & A. 1946) and Dickerson v. Camden Trust Company, 1 N.J. 459 (Sup. Ct. 1949), barred the re-opening of the 1932 decree and the assertion of wrongdoings prior thereto. We do not so interpret them. While the decrees there passed upon were stated to be res judicata, neither case involved or dealt with a situation where the cestui asserted prior self-dealing, self-interest, private profit taking and related wrongdoing not disclosed in the accounting approved by the decree. Cf. In re Enger's Will, supra, where the Court pointed out that "Self-dealing by a trustee is not a matter involved in an accounting proceeding by a trustee, where the account and the petition for the allowance thereof do not *205 apprise the beneficiaries of the fact." We recognize that there is a public policy in favor of the stability and finality of decrees and that cestuis may justly be held responsible for matters apparent on the face of the account. We believe, however, that in the field of fiduciary relationships this policy should give way to the entrenched and wholesome public policy, of greater force, which prohibits such conduct by trustees, requires full and frank disclosure thereof, and sanctions reliance by cestuis upon their trustees without independent investigation to obtain withheld or omitted information. We are satisfied that the lower Court, under the circumstances presented to it, properly opened the 1932 decree and received evidence of the alleged wrongdoings prior thereto. We are likewise satisfied that there was no sufficient evidence of disclosure to the cestuis which would support the trustee's contention that their conduct thereafter constituted acquiescence or the basis of estoppel independent of the 1932 decree. See In re Bender's Estate, 122 N.J. Eq. 192, 199 (Prerog. 1937); affirmed, 123 N.J. Eq. 171 (E. & A. 1938). Although the recent amendment of R.S. 3:10-18 by P.L. 1947, c. 398, has been referred to, we have not considered its meaning and effect since it admittedly cannot be applied to the earlier proceedings in the instant matter.

II.

THE MORTGAGES.
After the trust was set up and prior to the accounting in 1932 the trustee acquired the mortgages listed in the lower Court's opinion as Nos. 1 to 17, inclusive (except No. 15). All of these mortgages, apart from 1 and 8, were acquired by the plaintiff and transferred to the trust under substantially the following circumstances:
Customers of the plaintiff bank made application for mortgage loans. In connection therewith the bank made certain charges, including premiums for title policies issued by the plaintiff. The plaintiff maintained no title plant and made no title searches but obtained reinsurance from the Commonwealth *206 Title Company, remitted portions of the premiums and title search fees to the Commonwealth and retained the balance as its profit in its individual capacity. The Commonwealth policies were issued to the plaintiff and the plaintiff's policies were issued in its own favor as mortgagee. The mortgages remained in what the plaintiff describes as its "pool of mortgages" and ultimately some were transferred to customers of the bank, some to trusts being administered by the bank, and some were retained in the bank's individual capacity. The mortgages which were transferred to the Seidel trust remained in this pool for periods which varied from five days after original acquisition by the bank until over two years thereafter. Two of the mortgages were transferred from the pool, apparently first to other trusts, and then to the Seidel trust. When the mortgages were transferred to the Seidel trust there were no investigations as to soundness of the investments for trust purposes, the assumption evidently being made that any mortgage in the pool was suitable. However, the lower Court found, upon ample evidence, that in connection with the original acquisition of the mortgages by the bank there had been inadequate appraisals and examinations of the responsibility of the borrowers, and excessive loans in relation to the value of the security.
The mortgages listed as No. 1 were taken originally in the bank's name as trustee for the Seidel trust. However, they were taken in the course of the Caskey transaction which has been fully described in the lower Court's opinion. See 142 N.J. Eq. 516. Without repeating its description, suffice it to state that, as a result of that transaction and the use of funds received from the Seidel trust, the bank relieved itself of a loan which it had made, in its individual capacity, on the basis of security which was in part forged. One mortgage, listed as No. 8, was taken in the name of "Liberty Title and Trust Company Trust Funds" and without any investigation of the financial responsibility of the borrower until long after the mortgage had been issued under the customary circumstances involving payment to the bank of premium and search fee.
*207 Under fundamental trust principles, there is a comprehensive duty of loyalty owed by a trustee to beneficiaries of the trust. In the light of this duty it is improper for a trustee to sell his individual property to the trust. See Scott, The Trustee's Duty of Loyalty, 49 Harv. L.R. 521, 539 (1936):
"Just as it is improper for a trustee to sell trust property to himself individually, so conversely it is improper for him to sell his individual property to himself as trustee. Such a sale is improper even though had he purchased the property from a third person it would have been a proper trust investment, and the trustee acted in good faith and received from the trust estate no more than a fair price for the property. Thus, in Cornet v. Cornet the defendant trustee was in the habit of purchasing securities in his own name, paying the purchase price out of his own funds, and afterward distributing the securities at cost to various estates held by him in trust or to his own account as seemed to him desirable. He purchased certain securities in this manner and subsequently distributed them to one of the trusts, and they afterward depreciated in value. It was held that the trustee was liable for the loss. The court said that if he were permitted to do this `it would place before him the constant temptation to make the trust fund a dumping ground for his own unsatisfactory ventures.'"
See also In re Bender's Estate, supra; Gates v. Plainfield Trust Company, 121 N.J. Eq. 460 (Ch. 1937); affirmed, 122 N.J. Eq. 366 (E. & A. 1937); In re Binder's Estate, 137 Ohio St. 26, 27 N.E.2d 939 (Sup. Ct. 1940); In re Ryan's Will, supra.
When the plaintiff bank took mortgages in its individual capacity with a view towards ultimately distributing them amongst its customers, its trusts and itself, it placed itself in a position of divided loyalty and subjected itself to improper temptation. Thus, in each instance of selection, arose the possibility of a conflict between the interests of the trust on the one hand and the interests of the bank's commercial department on the other hand. Cf. In re Binder's Estate, supra, where the Supreme Court of Ohio, in condemning transactions similar to the plaintiff's transfers from its pool of mortgages to its trusts, stated:
"Many banking institutions are organized with several departments such as commercial, savings, trust, bond, loan, real estate, etc. Interdepartmental *208 transactions in such banks cannot be regarded as dealing at arm's length, as between independent entities. Departmental banks, after all, are single corporate entities, managed by a single board of directors and owned by shareholders who participate in the combined profits and losses of the several departments. Transactions, therefore, between separate departments, affecting a trust for which the bank is trustee, do not create any immunity against self-dealing as between the bank and the trust, because such transactions, in fact, constitute self-dealing. Ulmer v. Fulton, Supt., supra; Restatement of Law of Trusts, 431, section 170, comment i and illustration 3; In re Trusteeship of Riordan, 216 Iowa 1138, 248 N.W. 21; Larson v. Security Bank & Trust Co., 178 Minn. 209, 224 N.W. 235, 226 N.W. 697; Marchant v. Wannamaker, 176 S.C. 369, 180 S.E. 350."
The same Court, in applying its holding to instances where the bank had transferred mortgages held in its individual capacity to a trust and then from that trust to another trust, pointed out that:
"If a trust-to-trust sale of a fraud-infected or breach-of-trust-infected security, made so by a sale to the first trust, exonerates the trustee or removes his guilt as to the second sale, the law against self-dealing is defeated. Such a rule would allow a trustee openly to sell his own property to one of his trusts and escape the consequences of his breach of trust by selling or transferring the property at the same price to another of his trusts. No beneficiary would have occasion to complain as to the original transaction, and no beneficiary could complain as to the second."
The plaintiff contends that its conduct in transferring mortgages held by it in its individual capacity to the trust did not constitute improper self-dealing under the decisions in Cox v. Camden Safe Deposit and Trust Company, 124 N.J. Eq. 490 (Ch. 1938), and Pike v. Camden Trust Company, 128 N.J. Eq. 414 (Ch. 1940). Examination of those cases discloses that they did not involve a situation where, as here, the trustee took and held mortgage investments in its individual capacity and, from time to time thereafter, made selections from the mortgages owned by it for transfer to the trust with resultant divided loyalty and temptation to use the trust as "a dumping ground for securities left on its shelves." See Scott, supra, 49 Harv. L.R. 521 at 544.
*209 The contention has been advanced that mortgages Nos. 2 to 5, inclusive, should be distinguished from the others because they were allegedly purchased by the plaintiff "for the investment of the expected proceeds of the sale of the U.G.I. shares" held by the Seidel trust. The evidence supporting this allegation is not satisfactory; in any event, there was self-dealing with these mortgages as with the others. They were not transferred to the trust immediately upon acquisition; on the contrary, the plaintiff purchased them with its own funds and held them in the mortgage pool, in its individual capacity, for periods varying from five days to over three months, during which time it could freely have concluded to retain them itself or to transfer them to customers. The divided loyalty and temptation are as evident here as in the other described transactions.
Mortgages Nos. 7 and 12 were transferred from the pool of mortgages, apparently first to other trusts, and then to the Seidel trust. The suggestion has been made that perhaps the self-dealing between the plaintiff and these other trusts was authorized by special conditions, such as express provisions in their trust instruments, and that if they were lawfully transferred in the first instance to the other trusts their subsequent transfer to the Seidel trust might be within the trustee's authority. Cf. Restatement, Trusts, § 170, p. 440. The record contains no evidence whatever in support of this suggestion and, in the absence thereof, we may properly infer from the pertinent circumstances that these other trusts were fully entitled to the protection of the acknowledged rule against self-dealing by trustees and that the trustee could not relieve itself of responsibility by transferring the "breach-of-trust-infected security" to the Seidel trust. See In re Binder's Estate, supra.
Apart from its self-dealing in transferring mortgages held in its individual capacity to the trust, the trustee improperly made and retained a private profit. That the profit may have been relatively small is not significant (Shanley's Estate v. Fidelity Union Trust Company, 108 N.J. Eq. 564 (Ch. 1927)); weighing all of the attendant circumstances, *210 we believe that it was a contributing factor in the bank's laxity in the making of the loans on the security of the mortgages including mortgage No. 8, taken in the name of "Liberty Title and Trust Company Trust Funds." In so far as the Caskey transaction (mortgages No. 1) is concerned, the self-interest of the bank seems to us entirely apparent and in violation of elementary principles governing the trust relation. See Restatement, Trusts, § 170 (1935).
We have concluded that the exceptions to all of the trustee's mortgage investments designated as items 1 through 17 (except 15, which was the decedent's investment) were properly sustained.

III.

THE TRACTION STOCKS, MORTGAGE No. 15 AND THE CERTIFICATE.
At the time of the decedent's death he owned certain shares in the Union Traction Company and the Electric and People's Traction Company, as well as mortgage No. 15. These became part of the trust as originally set up and were listed in the schedule of assets in the 1932 accounting. Although the exceptions filed at that time by Louise Plews attacked the stated valuation of these assets, no charges were made that the trustee had been guilty of any breach of trust in retaining these investments of the decedent. The stock market crash had occurred three years earlier and the exceptants were aware that the stock had dropped sharply and that the real estate market had been declining rapidly. These circumstances render applicable the decisions in Pollack v. Bowman, supra, and Dickerson v. Camden Trust Company, supra, to the effect that the 1932 decree bars the exceptants from asserting that the failure of the trustee to dispose of the Traction stock and mortgage No. 15 prior thereto, action which was apparent from the face of the accounting, constituted a breach of trust. However, the respondents advance the contention that the conduct of the trustee in retaining *211 the stock and mortgage after the 1932 decree was imprudent and did not constitute the proper discharge of the plaintiff's trust responsibilities. The evidence indicates that the trustee periodically considered whether to dispose of the Traction stock in view of the declining market but concluded to retain it in the belief that "the stock market quotations did not fairly reflect the intrinsic value." The evidence further indicates that efforts were made to dispose of the asset represented by mortgage No. 15 but that these efforts were frustrated by the depression.
Under the twenty-second paragraph of his will, the testator had provided that the trustee shall not be liable for any depreciation in the value of his investments and that the retaining of his investments shall not be construed to be negligence by the trustee "no matter what may be the depreciation in the value of any of said investments or the change in their market prices." While this clause is to be strictly construed, the trustee is nevertheless entitled to its benefit as thus construed. See Farr v. First Camden National Bank and Trust Company, 4 N.J. Super. 89, 94 (App. Div. 1949). In determining whether the trustee acted reasonably and prudently in continuing to hold the Traction stock after the 1932 decree, it must be borne in mind that a substantial depreciation had already occurred, that the testator contemplated that his trustee might properly exercise its judgment to retain his Traction stock notwithstanding depreciation in value and that the exceptants in 1932 had, in effect, approved its retention of the stock to that date notwithstanding their awareness of severe drops in market quotations. We believe that under these circumstances, and absent the benefit of hindsight, the trustee's action, in retaining in good faith the Traction stock in its endeavor to obtain for the trust a sum approaching what it deemed its true value, ought not be deemed unreasonable or imprudent. See In re Griggs' Estate, 125 N.J. Eq. 73 (Prerog. 1939); affirmed, 127 N.J. Eq. 362 (E. & A. 1940); In re Cross' Estate, 117 N.J. Eq. 429 (E. & A. 1935). In so far as mortgage No. 15 is concerned, we find no substantial evidence that after the 1932 decree *212 the trustee failed to act reasonably and prudently in its management and disposition.
The 1932 accounting listed an item as "Certificate  $8,300." Although the exceptions filed by counsel for Louise Plews questioned the valuations of all of the securities listed in the schedule attached to the account, no question was raised, although apparent from the face of the account, as to the propriety of investing in the Certificate. The Certificate evidently represented participation in mortgages and has been reduced by principal payments to $446.50. The pertinent evidence in the record is meager and contains nothing indicating, in this connection, self-dealing, self-interest, private profit taking or similar wrongdoing. As we construe paragraph twenty-four of the decedent's will, the trustee was not strictly confined to investments declared legal for trust purposes by our statutes and we consider that under Pollack v. Bowman, supra, and Dickerson v. Camden Trust Company, supra, the exceptants are barred from asserting that the trustee acted imprudently in acquiring the certificate.
We have concluded that the exceptions to the retention of the Traction stocks and mortgage No. 15 and the acquisition of the Certificate should have been disallowed.

IV.

INTEREST AND COUNSEL FEES.
The lower Court held the trustee responsible not only for the principal where the exception to the investment was sustained, but for interest as well, and directed that it be charged with the amount of income actually received by it "but in no event at a rate of simple interest less than four per cent per annum." This determination was equitable and well within the power of the lower Court, recognized by the authorities. See 2 Scott, Trusts (1939), § 207 et seq. However, the cross-appellants contend that the judgment, as entered in accordance with supplemental conclusions relating to its form, was erroneous in permitting the plaintiff to average the income received over the entire period in which the *213 investment was held and then charging it with that sum if in excess of 4%, otherwise at 4%. The cross-appellants urge that in lieu of the entire period of the investment a shorter period (annual or less) should be taken and that the trustee should be charged for the entire income during such shorter period where it exceeds 4%, otherwise at 4%. See In re Ryan's Estate, 181 Misc. 566, 48 N.Y. Supp.2d 522 at 542 (Sur. Ct. 1941); affirmed, 291 N.Y. 376, 52 N.E.2d 909 (Ct. of App. 1943). We consider that the lower Court had wide discretion in fixing the amount of interest and that while it might properly have accepted the method now advanced by the cross-appellants it was under no compulsion to do so. We find no error in the interest provision of the judgment.
Where the surcharge is sustained, no objection is voiced by the trustee to the lower Court's determination that the beneficiary is entitled to principal and income and where the income yields less than 4% the trustee shall contribute the deficiency. However, paragraph seven of the judgment disallowed all credits claimed by the trustee representing expenses in connection with any of the investments with which it was surcharged, despite the trustee's contention that where it received real estate through defaulted mortgage investments credit should have been allowed to it for essential maintenance expenses actually incurred subsequent to its acquisition and rental, subject in any event, to the beneficiaries' right to the minimum of principal and 4% interest. We believe this limited contention should have been accepted, its rejection operated inequitably and resulted in undue enrichment of the exceptants and the judgment should be modified accordingly. Cf. Gilligan v. Daly, 79 N.J. Eq. 36, 41 (Ch. 1911).
The trustee contends that the lower Court's allowances to counsel for the exceptants, payable by the plaintiff in its individual capacity, were in violation of Rule 3:54-7 and were, in any event, excessive. The trial below was completed well in advance of the adoption of the new rules and the lower Court's opinion was filed on July 15, 1948. Thereafter, it was necessary to enter judgment formally and this *214 might readily have been done prior to September 15, 1948, although it was actually entered thereafter. It seems to us that Rule 3:54-7 should not be applied to the situation thus presented so as to prejudice the exceptants who had proceeded to completion of the cause, except for formal entry of the judgment, under pre-existing rules. Cf. Rule 3:1-2; P.L. 1948, c. 367. However, a review of the record has led us to the conclusion that, notwithstanding the extensive nature of the proceedings, the fees granted to counsel for the exceptants should be reduced and the following allowances made to them: to counsel for Louise Plews, $15,000 and disbursements; to counsel for Lillian Welzel, et al., $12,500 and disbursements; to counsel for Joseph M. Wells, et al., $10,000 and disbursements.
The judgment is modified and the cause is remanded to the Chancery Division for further proceedings in accordance with this opinion.